IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Johnny Edward Johnson, | No. CIV 05-1372-PHX-DGC (DKD) |
| Petitioner, | |
| vs. | **REPORT AND RECOMMENDATION** |
| Dora B. Schriro; Terry Goddard, | |
| Respondents. | |

TO THE HONORABLE DAVID G. CAMPBELL, U.S. DISTRICT JUDGE:

On May 9, 2005, Johnny Edward Johnson filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction for forgery in Maricopa County Superior Court, with two historical prior felony convictions, and the court's imposition of a presumptive 10 year prison term. In his federal petition he contends: 1) the Arizona Supreme Court erred in denying his appeal in violation of the Fifth, Sixth, and Fourteenth Amendments; 2) the trial court erred when it admitted "evidence extraneous to the case" before the jury, in violation of his rights to due process and a fair trial; 3) the trial court erred when it admitted hearsay evidence of uncharged crimes in violation of his rights to due process, a fair trial, and confrontation of his accusers; and 4) his due process rights were violated when the state used three prior convictions, more than 10 years old, to enhance his sentence. Respondents contend that Johnson's petition, filed seven months after the one-year limitations period, is untimely, and in the alternative that this claims are procedurally defaulted. The Court recommends that the petition be denied and dismissed with prejudice.

**FACTUAL BACKGROUND**

The evidence considered at trial is summarized in the Court of Appeals memorandum decision:

> Johnson entered a store with a check written on the account of Sarah and Monte Plough. The check, for $800, was completed but for the payee line. The store clerk observed Johnson write his name on the payee line and sign the back of the check.
>
> The clerk asked Johnson for identification. Johnson gave him his bank check card, which displayed his photograph. The check looked "funny," according to the clerk, so he looked up the Ploughs' phone number and called them. He spoke with a woman who said the check was not valid. The clerk then told the off-duty police officer/security guard at the store about the incident.
>
> Meanwhile Johnson, a longtime store customer, was talking to the manager, whom he had known for a number of years. He made no attempt to leave the store.
>
> The guard arrested and searched Johnson. He found an "organizer," which contained checkbooks belonging to other individuals, and vehicle registration and insurance information in the name of another person. The organizer also contained a check that was partially completed. It was in the amount of $600, but had no payor signature or payee name filled in.
>
> Inside Johnson's wallet were credit cards belonging to two persons, a cash machine card belonging to another, and two social security cards belonging to two difference persons. None of the items had Johnson's name on them, nor did any of the evidence belong to the Ploughs.
>
> Johnson told the guard he found the organizer and its contents on the way to the store. He said a woman he knew had given him one of the credit cards to buy clothes, and that he had found the other cards two days earlier near a trash can.
>
> Johnson testified he obtained the check that he attempted to cash as payment for work he had done at a house and a trailer for a woman who said her name was "Sarah." He described "Sarah" as about 40 years old, rather heavy set, short, and with brownish-grey hair. He said the house was near 99th Avenue and Camelback Road, and that the trailer, Number 15, was near 51st Avenue and Bethany Home Road.
>
> While he worked at the trailer, Johnson saw several people he thought were residents. One was a thin woman in her 20s, about 5'7" tall, with straight, brown hair.
>
> After Sarah allegedly gave him the check, Johnson went to his neighborhood market to buy food and to cash the check. He explained he had asked Sarah to leave the payee line on the check blank in the event he would

> need someone with better identification, such as his girlfriend, to cash it for him.
>
> Johnson testified he found the organizer on the way to the market. He found two of the cards a couple days earlier near where he had found the organizer. He said he planned to try to find the owners and return the items.
>
> After the guard detained him at the store, Johnson called Sarah with a number she had given him and handed the phone to the guard. The guard identified himself as a police officer and asked the woman some questions, including whether her name was Sarah. After a brief conversation, the woman hung up.
>
> Jean Lockhart testified for the defense. She was the manager of a trailer park located at 51st Avenue and Bethany Home Road. She said two men and a woman lived in Trailer 15. The woman was in her 20s, about 5'4" tall, with long, brown hair. Lockhart said the woman tried to pay her with a stolen check. Lockhart called police, who arrested the woman.
>
> Lockhart said she had also seen another woman at trailer 15. This woman appeared to be in her 50s, about 5'3" tall, chubby, with brown and gray hair. Lockhart had never before seen Johnson and did not know his name.

(Doc. #9, Exh B at 3-6).

Johnson argued to the Arizona Court of Appeals that the trial court abused its discretion and violated his right to due process and a fair trial by admitting evidence suggesting other crimes and bad acts by Johnson (*Id*., Exh A). He also contended that the trial court erred by admitting hearsay statements of uncharged crimes in violation of Johnson's rights under the Confrontation Clause (*Id*.). On July 17, 2003, the Court of Appeals issued its memorandum decision (*Id*., Exh B). The Court of Appeals found that Johnson had waived his fair trial constitutional claim; that the evidence was properly admitted as evidence of his intent to defraud; and that Johnson had opened the door to admission of the hearsay with his cross-examination (*Id*.).

Appellate counsel informed Johnson in a letter dated August 21, 2003, that she would not file a petition seeking discretionary review from the Arizona Supreme Court, indicating there was no reasonable probability that the court would review Johnson's case (*Id*., Exh C). Counsel also informed Johnson that he had a right to seek such review, explained the process for doing so, informed him that he had 30 days from the date of the letter to file the petition

1  for review, and that she had filed a motion to extend the time for Johnson to file a *pro se*
2  petition for review (*Id.*). Counsel included with her letter the complete record on appeal.

3  On August 26, 2003, the Court of Appeals granted Johnson 30 days' leave to file a *pro*
4  *se* petition for review, indicating that "absent unforeseeable and compelling circumstances,
5  no further extensions of time will be granted" (*Id.*, Exh D, E). Johnson declined to file a
6  petition for review, nor did he seek any further extensions; on October 2, 2003, the Court of
7  Appeals issued its mandate (*Id.*, Exh F). On March 3, 2005, almost one and one half years
8  later, Johnson sought leave to file a delayed petition for review, on the grounds that 1)
9  appellate counsel "declined to pursue this cause to the Arizona Supreme Court;" and 2)
10 Johnson has no legal expertise or "assets to hire private counsel." He also asserted as
11 follows:

> During this period, petitioner was transferred to Lewis Complex. Part of his case files were lost and then the prison hostage incident froze all movement and any attempts to write or talk to staff about legal work. During the many shakedowns and searches, the remainder of petitioner's files were taken or presumed lost. Any attempts to locate the files was met with one reply. "We got more important issues to address."

(*Id.*, Exh G). He contends that following his transfer to ASPC Tucson, and after repeated calls by his counselor to the Lewis Complex, in *December, 2004*, most of the files were recovered. On March 14, 2005, the Court of Appeals denied his request for a delayed petition for review (*Id.*, Exh H). On May 9, 2005, Johnson filed his federal habeas petition.

Johnson was required to file his federal petition within one year of the date on which the judgment became final by the conclusion of direct review or the expiration of time available to seek such review. *See* 28 U.S.C. § 2244(d)(1)(A). His conviction became final on September 22, 2003, the date upon which the time for seeking review expired. Therefore, he had until September 22, 2004 to file his petition. His federal petition, filed more than seven months after this date, is therefore untimely, unless he is entitled to either statutory or equitable tolling.

- 4 -

1 Respondents contend that Johnson did not seek collateral review in state court, thus 2 allowing statutory tolling for the period of time that a properly filed petition was pending. 3 A more accurate statement is that Johnson did not seek collateral review in a *timely* manner, 4 and for that reason may not be entitled to tolling. *See* 28 U.S.C. § 2244(d)(2); *Pace v.* 5 *Diguglielmo*, 125 S.Ct. 1807 (2005).  A review of the Maricopa County Superior Court 6 Criminal Docket #CR2002-000929 indicates that Johnson's initial Notice of Post-Conviction 7 Relief was withdrawn at his request in October, 2002, pending completion of direct review. 8 In October, 2003, upon receipt of Johnson's renewed Notice of Post-Conviction Relief, the 9 trial court appointed counsel, granted him two extensions of time to file his petition, and in 10 January, 2004, upon review of counsel's Completion of Post-Conviction Review, allowed 11 Johnson until March 10, 2004 to file a petition. On March 18, 2004, the trial court dismissed 12 the Rule 32 proceeding because of Johnson's failure to file a petition by the March 10 13 deadline.[1]

14 Apart from statutory tolling, Johnson must show extraordinary circumstances beyond 15 his control which made it impossible for him to timely file his *federal* petition, in order to 16 qualify for equitable tolling. *See Green v. White*, 223 F.3d 1001, 1003 (9th Cir. 2000).  A 17 review of state court records indicate that as of August 21, 2003, when counsel sent Johnson 18 a copy of the complete record on appeal, he was *already* housed at the Lewis Complex.  This 19 undercuts his argument that as part of the transfer to Lewis, he lost his court papers.  In 20 addition, the hostage crisis occurred in January, 2004, three months *after* the expiration of 21 time for filing a petition for review.  Johnson has presented no information that would 22 indicate that he was unable to file anything during the time period of September, 2003 to 23 January, 2004.  Indeed, he was able to file a Notice of Post-conviction relief, and received 24 extensions of time to file his Rule 32 petition during this time.

---

[1] The Court notes, however, that it was during this period between January and March, 2004, that it would have been difficult if not impossible for Johnson to file anything because of the circumstances surrounding the hostage crisis at the Lewis Unit.

- 5 -

However, it appears that starting in January, 2004, his lack of access and ability to file pleadings or receive court orders became problematic. In his Reply, Johnson asserts that his legal records were lost for a year; and that "diligence was applied to recover enough of them to file a Habeas Corpus to the Az. Supreme Court" (Doc. #10 at 2). Johnson is apparently referring to his Motion for Delayed Petition for Review, filed with the Arizona Court of Appeals in March, 2005. Even accepting Respondents' argument that Johnson could have filed for *discretionary* review in September, 2003, it is still most likely that, as was the case with his pursuit of collateral review, he was restrained by the circumstances surrounding the hostage crisis and his later transfer to Tucson from pursuing his federal petition for a significant portion of 2004. We believe that Johnson has established that the extraordinary circumstances were the "but-for and proximate cause of his untimeliness." *See Allen v. Lewis*, 255 F.3d 798, 800 (9th Cir. 2001). As the Ninth Circuit explained:

> It will normally be much more difficult for a prisoner to demonstrate causation where he encounters the "extraordinary circumstances" in the beginning or middle of the limitations period than where he encounters them at the end of limitations period. This is the case because, if the prisoner is diligently pursuing his habeas petition, the one-year limitations period will ordinarily give him ample opportunity to overcome such early obstacles.

(*Id.*).

In *Allen*, the prisoner lost access to his habeas materials for only 27 days due to his prison transfer. In addition, the transfer occurred only one month into the limitations period.

> This left Allen with the better part of the limitations period in which he could have filed his federal petition uninhibited by the prison transfer. It is clear that any effect the prison transfer had on the preparation of his habeas materials was dissipated during these many months.

(*Id.* at 801).

In this case, the extraordinary circumstances were both multi-layered and long-lasting. The combination of obstacles present in both his state and federal proceedings as a result of the hostage crisis, and the loss of his records for over a year, *and not his lack of diligence*, leads the Court to conclude that this is one of those limited circumstances in which the doctrine of

- 6 -

1  equitable tolling should apply, and allow the Court to consider his federal petition timely
2  filed.

## EXHAUSTION OF REMEDIES

4  A state prisoner must exhaust his state remedies before petitioning for a writ of habeas
5  corpus in federal court. 28 U.S.C. § 2254(b)(1) & (c); *Duncan v. Henry*, 513 U.S. 364, 365-
6  66 (1995); *McQueary v. Blodgett*, 924 F.2d 829, 833 (9th Cir. 1991). To properly exhaust
7  state remedies, a petitioner must fairly present his claims to the state's highest court in a
8  procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 839-846 (1999). In
9  Arizona, a petitioner must fairly present his claims to the Arizona Court of Appeals by
10 properly pursuing them through the state's direct appeal process or through appropriate post-
11 conviction relief. *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999); *Roettgen v.*
12 *Copeland*, 33 F.3d 36, 38 (9th Cir. 1994). A claim has been fairly presented if the petitioner
13 has described both the operative facts and the federal legal theory on which the claim is
14 based. *Bland v. Cal. Dep't of Corrections*, 20 F.3d 1469, 1472-73 (9th Cir.1994), *overruled*
15 *on other grounds by Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc); *Tamalini*
16 *v. Stewart*, 249 F.3d 895, 898-99 (9th Cir. 2001). The exhaustion requirement will not be
17 met where the Petitioner fails to fairly present his claims. *Roettgen*, 33 F.3d at 38.

18 If a petition contains claims that were never fairly presented in state court, the federal
19 court must determine whether state remedies remain available to the petitioner. *See Rose v.*
20 *Lundy*, 455 U.S. 509, 519-20 (1982); *Harris v. Reed*, 489 U.S. 255, 268-270 (1989)
21 (O'Connor, J., concurring). If remedies are available in state court, then the federal court
22 may dismiss the petition without prejudice pending the exhaustion of state remedies. *Id.*
23 However, if the court finds that the petitioner would have no state remedy were he to return
24 to the state court, then his claims are considered procedurally defaulted. *Teague v. Lane*, 489
25 U.S. 288, 298-99 (1989); *White v. Lewis*, 874 F.2d 599, 602-605 (9th Cir. 1989). The federal
26 court may decline to consider these claims unless the petitioner can demonstrate that a
27 miscarriage of justice would result, or establish cause for his noncompliance and actual

prejudice. *See Schlup v. Delo*, 513 U.S. 298, 321 (1995); *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 86 (1977); *United States v. Frady*, 456 U.S. 152, 167-68 (1982).

Further, a procedural default may occur when a Petitioner raises a claim in state court, but the state court finds the claim to be defaulted on procedural grounds. *Coleman*, 501 U.S. at 730-31. In such cases, federal habeas review is precluded if the state court opinion contains a plain statement clearly and expressly relying on a procedural ground "that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision." *See Harris*, 489 U.S. at 260. A state procedural default ruling is "independent" unless application of the bar depends on an antecedent ruling on the merits of the federal claim. *See Ake v. Oklahoma*, 470 U.S. 68, 74-75 (1985); *Stewart v. Smith*, 536 U.S. 856 (2002). A state's application of the bar is "adequate" if it is "'strictly or regularly followed.'" *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) (quoting *Hathorn v. Lovorn*, 457 U.S. 255, 262-63 (1982)). In cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, just as in cases involving defaulted claims that were not fairly presented, federal habeas review of the claims is barred unless the prisoner can demonstrate a miscarriage of justice or cause and actual prejudice to excuse the default. *See Coleman*, 501 U.S. at 750-51.

In Ground I, Johnson essentially argues a denial of access to the courts, again reciting the litany of obstacles he faced during 2004, but also emphasizing the lack of law libraries and legal assistants (Doc. #1 at 5). Respondents are correct that Johnson has argued this for the first time in his federal petition. More importantly, a claim of lack of access to the courts is not cognizable in a federal habeas proceeding: simply put, it is a complaint concerning the conditions of his confinement, not the legality of his confinement. For that reason, it fails.

In Ground II, Johnson argues, as he did on direct appeal, that the trial court admitted evidence extraneous to the case before the jury, as other crimes and bad acts, depriving Johnson of due process and a fair trial. The evidence to which Johnson is referring is the

1  contents of an organizer and wallet found in his possession when he was arrested, which
2  contained checks, checkbooks, credit cards, and vehicle registration information in the names
3  of several individuals other than Johnson or the victims.  However, the Court of Appeals
4  found that Johnson had waived his constitutional claim by his failure to assert it at the
5  suppression hearing, and his failure to support it on appeal with argument or case authority
6  (Doc. #9, Exh B at 6).  In doing so, the state court found the claim to be defaulted on
7  procedural grounds.  *Coleman*, 501 U.S. at 730-31.  The memorandum decision contains a
8  plain statement clearly and expressly relying on a procedural ground "that is both
9  'independent' of the merits of the federal claim and an 'adequate' basis for the court's
10 decision."  *See Harris*, 489 U.S. at 260.  The Court of Appeals also concluded that under a
11 Rule 403 analysis, the evidence was properly admitted as probative, circumstantial evidence
12 of Johnson's intent to defraud, and although it was harmful to Johnson, it was not unfairly
13 prejudicial (Doc. #9, Exh B at 7-8).  Assuming Johnson could overcome the procedural
14 default obstacle, his claim is without merit.  *See* 28 U.S.C. § 2254(b)(2).

15         In Ground III, Johnson contends, as he did on appeal, that the trial court admitted
16 hearsay statements of uncharged crimes which denied his due process right to a fair trial and
17 confrontation of his accusers.  Specifically, he asserts that once the above testimony was
18 admitted, the police were allowed to "act as expert witnesses" when there was no nexus
19 between the crime Johnson was convicted of and the unrelated evidence admitted at trial
20 (Doc. #1 at 7).  In cross-examining the police officer, Johnson asked the officer if he had
21 spoken with any account holders.  Then on redirect examination, the prosecutor asked what
22 information the officer received from the account holders with whom he spoke, and the trial
23 court overruled Johnson's hearsay objection, finding that he had opened the door by asking
24 the officer whether he had spoken with any account holders (Doc. #9, Exh B at 9-10).
25 Johnson argued on appeal and in his federal petition that the trial court abused its discretion
26 and violated his constitutional right to confront witnesses by permitting the police officer to
27 present the hearsay information.  Initially, the Court of Appeals found that because Johnson
28

1  failed to make a constitutional claim at trial, it would review for fundamental error. It then
2  found the trial court did not err:

> Johnson's inquiry created the inference that none of the other property had been wrongly taken, or that any of the other checks had been forged. This, in turn, lent credence to Johnson's testimony that he had found the organizer and other credit cards. That evidence opened the door for the state to rebut it by presenting contrary evidence on the same subject.

6  (*Id*. at 12-13).

7  Respondents argue that this ruling constitutes an independent state law ground barring
8  federal review of any underlying federal claim. It appears to the Court less complicated:
9  the Court of Appeals did not consider Johnson's constitutional claim; instead it determined
10 that the trial court ruled correctly on an evidentiary issue. Johnson's claim is without merit.
11 § 2254(b)(2).

12 In Ground IV, Johnson argues for the first time that the state charged him with three
13 priors that were clearly over 10 years old, and could not be used to increase his sentence, in
14 violation of his due process rights. Johnson was required to fairly present all his claims to
15 the Arizona Court of Appeals by properly pursuing them through the state's direct appeal
16 process or through appropriate post-conviction relief. *Swoopes v. Sublett*; *Roettgen v.*
17 *Copeland*. In addition, Johnson would have no state remedy were he to return to the state
18 court, so this claim is procedurally defaulted. *Teague v. Lane*; *White v. Lewis*.[2] Finally, he
19 has shown no cause or prejudice to excuse the default. *See Coleman*.

20 **IT IS THEREFORE RECOMMENDED** that Petitioner Johnny Johnson's Petition
21 for Writ of Habeas Corpus be **DENIED** and **DISMISSED WITH PREJUDICE** (Doc. #1).

22 This recommendation is not an order that is immediately appealable to the Ninth
23 Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of

---

[2] Assuming Johnson had exhausted this claim by raising it in his Rule 32 petition - which extraordinary circumstances may have prevented him from doing - the trial court would have properly denied it, finding it was precluded because Johnson could have raised it on direct appeal, and did not do so. *See* Rule 32.2(a)(1), Ariz. R. Crim. P.

Appellate Procedure, should not be filed until entry of the district court's judgment. The parties shall have ten days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. *See,* 28 U.S.C. § 636(b)(1); Rules 72, 6(a), 6(e), Federal Rules of Civil Procedure. Thereafter, the parties have ten days within which to file a response to the objections. Failure timely to file objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the district court without further review. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. *See* Rule 72, Federal Rules of Civil Procedure.

DATED this 12th day of September, 2005.

_____
David K. Duncan
United States Magistrate Judge